NOTICE

Decision filed 06/10/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240299-U

NO. 5-24-0299

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Montgomery County. |
| | ) | |
| v. | ) | No. 22-CF-363 |
| | ) | |
| ROGER PERKINS JR., | ) | Honorable |
| | ) | Christopher W. Matoush, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE SHOLAR delivered the judgment of the court.
Justices Boie and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The evidence was sufficient to convict defendant of unlawful possession of methamphetamine. Defense counsel was not ineffective for failing to request the pattern instruction defining the mental state of "knowledge." The trial court did not err by appointing counsel to represent defendant.

¶ 2    Following a jury trial, defendant Roger Perkins Jr., was convicted of unlawful possession of methamphetamine. On appeal, defendant raises three issues. First, he challenges the sufficiency of the evidence. Next, he argues that trial counsel was ineffective for failing to request a pattern instruction defining the mental state "knowingly." Finally, he contends that the trial court improperly denied defendant's request to proceed without an attorney. For the reasons that follow, we affirm defendant's conviction.

1

¶ 3                                    I. BACKGROUND

¶ 4     On October 9, 2022, Officer Tylor Knisley of the Litchfield Police Department was dispatched to the home of Pamela Schoate. Schoate called the police and told them that her grandson, defendant, broke a window on her home and was trying to get inside. Officer Knisley found defendant outside of the home and took defendant into custody. While searching defendant at the scene, Knisley found the corner of a clear plastic baggy that contained a white residue inside of it. Defendant was transported to the Montgomery County Jail. During a second search at the jail, "a small piece of tin foil [fell] off [defendant's] person."

¶ 5     On October 11, 2022, defendant was charged by information with attempt (residential burglary), a Class 2 felony, in violation of section 8-4(a) of the Criminal Code of 2012 (Code). 720 ILCS 5/8-4(a) (West 2020). Defendant made his initial appearance the same day via Zoom. The trial court told defendant that he could hire his own attorney, that one could be appointed to represent him if he could not afford an attorney, or that he could waive counsel and represent himself. Because defendant was being disruptive, the trial court muted defendant. When unmuted a short while later, defendant told the court that he was going to hire private counsel. The court set the matter for a status hearing three days later.

¶ 6     On October 14, 2022, the trial court held a hearing via Zoom. Defendant told the judge that he had not yet retained counsel. The matter was set for November 18 for appearance with counsel.

¶ 7     On November 18, 2022, defendant made his only appearance in front of Judge Brandmeyer. This hearing was also conducted via Zoom. Defendant explained that he had not yet hired an attorney. The following exchange occurred:

> "THE COURT: Sir, if you haven't hired a lawyer yet, it looks like we need to appoint an attorney for you.

THE DEFENDANT: Yeah, for right now because it's—but I do not want Ms. Mattson or nothing like that because last time she filed a motion mental health and she just did a big old—

THE COURT: Sir, here is the deal. If you are going to get a free lawyer, you don't get to choose which free lawyer you are going to get. Okay. I am going to appoint Ms.—I am going to appoint Ms. Mattson to represent you.

THE DEFENDANT: All right. So I'll hold off counsel. I will prohibit *pro se*. I will *pro se*.

THE COURT: Sir, I'm not going to—I am not going to permit that. I am going to appoint Ms. Mattson and then you can decide later on if you want to be represented by your own attorney. These are very serious charges.

THE DEFENDANT: Well, first of all, this is my grandma. My people already told me there was not—there is—they don't want the charges. It was an accident to my own place.

THE COURT: Sir, just a heads up. You are represented by an attorney now. It's probably not a good idea to talk with me because it's being recorded by this lady over here the court reporter. Sir, you don't get it. You are starting understand—you are starting to misunderstand the idea—

THE DEFENDANT: Donald Trump—

THE COURT: I am going to—I am going to mute mute this gentleman, please. You cannot—you cannot burst out like that in a courtroom. Okay. All right, sir. Ms. Mattson, you want January 23rd at 9 a.m.?

[THE STATE]: Your Honor, that might be a little far. Mr. Perkins hasn't had a prelim on this yet because he was wanting to hire private counsel. So if we could set it for first appearance with counsel and prelim. You want to do both?

MS. MATTSON: Yeah, that's a good idea. We could do December 19th at 1 even though I know I am scheduled a couple of things, but maybe stop there.

THE COURT: Mr. Perkins, your next court date is going to be December 19th at 1 p.m., and that is for your first appearance with your attorney and preliminary hearing.

For the record, sir, I will—I will note that it appears that you have been trying to talk the entire time. For whatever it's worth to you, if you want to keep doing it it's perfectly fine, but please know that you have been muted for the last couple of minutes.

All right. We will see you December 19, 2022 at 1 p.m. Thank you so much."

3

¶ 8     During the December 19, 2022, preliminary hearing, Officer Knisley testified about the circumstances surrounding defendant's arrest, including the fact that the on-scene search of defendant pursuant to the arrest revealed that defendant had a plastic baggy containing a white powder residue in his pocket. The residue field tested positive for the presence of methamphetamine. Toward the end of the hearing, defendant interrupted the court and was again muted for "not complying with the court's order." The trial court found probable cause.

¶ 9     On December 20, 2022, based upon Officer Knisley's testimony during the preliminary hearing, the State added count II. Count II alleged that defendant committed the offense of unlawful possession of methamphetamine, a Class 3 felony, in violation of section 60(a)(1) of the Code. 720 ILCS 646/60(a)(1) (West 2020). At a subsequent hearing, defense counsel acknowledged that the preliminary hearing covered the charge in count II. After a few continuances, the matter was set for a final pretrial conference on November 9, 2023, and a jury trial on November 27, 2023.

¶ 10    During the November 9, 2023, pretrial conference, defense counsel orally moved to continue the matter, telling the judge that defendant indicated that he "might hire" a defense attorney, although defendant had not yet spoken to the attorney. The judge denied the motion to continue "without prejudice." The judge told defendant that if the attorney entered their appearance and filed a written motion to continue the case, he would reconsider his decision, although there were "no guarantee[s]" any such motion would be granted due to the age of the case. Defendant never hired private counsel.

¶ 11    Defendant's trial began on November 27, 2023. At the outset of the trial, the State dismissed count I, the attempted residential burglary charge. The following evidence was presented at trial.

4

¶ 12    Officer Knisley testified that, on October 9, 2022, at approximately 7:40 a.m., he responded to a call at Schoate's home based upon her report that defendant broke a window and tried to enter the home. Upon arrival, he saw defendant outside the residence. After Knisley exited his squad car, defendant advanced toward Knisley. Defendant took off his jacket and began yelling. Because he could not see defendant's hands, Knisley drew his gun. As soon as he could see defendant's hands, Knisley switched to his taser. After being ordered to get on the ground several times, defendant complied. Officer McBride arrived on the scene and helped place defendant in custody.

¶ 13    Knisely searched defendant and located the corner portion of a clear plastic baggy with a white residue inside. Based upon his training and experience, Knisley believed that the residue was methamphetamine. The baggie was secured as evidence, and the residue subsequently field-tested positive for methamphetamine.

¶ 14    Knisley described defendant's behavior as "erratic" and testified that defendant made several threats against him. Because defendant made threatening statements during the ride to the jail, Knisley requested assistance at the jail. At the jail, defendant was searched by a corrections officer. During this search, Knisley observed "a small piece of tin foil fall off [defendant's] person." Knisley secured the tin foil with the corner of the plastic baggy.

¶ 15    Regarding why he did not discover the tin foil during the initial search of defendant, Knisley testified that defendant was wearing a pair of pants, a pair of shorts under the pants, and a hoodie, all of which had pockets. Knisley explained that the purpose of an initial search following an arrest is to search first for weapons then to gather smaller items. Knisley testified that sometimes smaller items are missed due to their size, or because there are multiple layers of clothing. Because he was wearing gloves, Knisley explained that it was possible that he missed the foil during the first search. Knisley testified that this is why a second, more thorough search was conducted at the

5

jail. Knisley identified the baggie and the foil that were seized. They were later admitted into evidence.

¶ 16 Knisley also testified that he was wearing a body camera during his interaction with defendant. There is no audio for the first 30 seconds. Knisley explained that when the body camera is activated, the 30 seconds of video prior to activation is automatically saved, but the camera does not begin capturing the audio prior to activation. The original video was approximately 34 minutes long and ended when Knisley turned it off at the jail. A shortened version of the video was admitted without objection and published to the jury.

¶ 17 The video supported officer Knisley's testimony. Regarding defendant's erratic behavior, the video showed that defendant shouted and refused Knisley's commands that he "get on the ground." Knisley called for backup as defendant raised his hands and told Knisley that "[i]t's illegal" and "[c]all my fucking lawyer, bro." In response to continued commands to get on the ground, defendant finally threw himself on the ground. Defendant then raised his head and slammed both fists into the ground two times before he grabbed a potted plant with his right hand. Defendant flung the plant behind himself while yelling, "I'm going to fucking kill you; I am going to fucking kill you bro, I swear to God." Unprompted, defendant then put his hands behind his back and told Knisley, "You better fucking arrest me." Defendant then calmed down for a moment and repeatedly invited Knisley to put the cuffs on him, saying, "Come on, come on, put the fucking cuffs on me. Come on, put them motherfuckers on me, bro." At this point, officer McBride arrived and defendant was cuffed. While being search, defendant talked about improper force and requested the Illinois State Police, saying that he wanted Knisley charged. Defendant also told Knisley that he "better keep the cuffs on me" and "[y]ou better watch it, I'm telling you that now."

6

Defendant continued saying largely unintelligible things as he was walked to and placed in the backseat of Knisley's squad car.

¶ 18    On cross-examination, Knisley testified that the foil "appeared to come somewhere from where [defendant's] hands were handcuffed," and that he believed that the correctional officer picked it up and placed in on the counter. Knisley also testified that defendant stated that he was at his grandmother's house to "get his clothes back." Knisley did not ask defendant whether the clothes he was wearing belonged to him or whether he borrowed the clothes. Knisley also testified that he put the foil into the evidence bag with the baggie corner. On redirect, Knisley testified that he did not observe any contraband on the outside of the foil, but that he opened it up and observed burnt residue on the inside of the foil.

¶ 19    Aaron Roemer testified that he was a forensic scientist with the Illinois State Police employed at the Springfield Forensic Science Lab, and that he received and tested the evidence. Roemer stated that there were two items in the evidence bag: foil containing a chunky substance that weighed approximately .004 grams and a plastic bag with some residue. Roemer tested the chunky substance from the foil and determined that it contained methamphetamine. He explained that he did not test the residue from the plastic bag because the additional weight from the residue would not have been sufficient to increase the penalty for the offense.

¶ 20    The State rested. Defendant moved for a directed verdict, arguing that "the State [had] not met the element of knowledge by defendant of having about six grains of salt amount of [a] substance containing methamphetamine on him." That motion was denied. Defendant did not present any evidence and defendant did not testify.

¶ 21    Following closing arguments, the jury found defendant guilty. Defendant filed a posttrial motion and again argued that the State failed to prove him guilty beyond a reasonable doubt.

Defendant's posttrial motion was denied and defendant was sentenced to five years in the Illinois Department of Corrections.

¶ 22 Appellate counsel for defendant filed a motion for leave to file late notice of appeal, which was granted by this court.

¶ 23                                                    II. ANALYSIS

¶ 24 Defendant raises three issues on appeal. First, he challenges the sufficiency of the evidence, arguing that the State failed to prove beyond a reasonable doubt that he knowingly possessed a substance containing methamphetamine. Second, defendant alleges trial counsel was ineffective for failing to ask that the jury receive the definition of "knowledge" pursuant to Illinois Pattern Jury Instruction, Criminal, No. 5.01B. Illinois Pattern Jury Instruction, Criminal, No. 5.01B (approved October 28, 2016) (hereinafter IPI Criminal No. 5.01B). Finally, defendant argues the trial court erred by appointing the public defender to represent him after he told the court that he wanted to proceed *pro se.* For the reasons that follow, we affirm. We consider each argument in turn.

¶ 25                                        A. Sufficiency of the Evidence

¶ 26 Defendant contends that the State did not prove him guilty beyond a reasonable doubt. Specifically, defendant argues that the State failed to prove that defendant *knowingly* possessed a substance containing methamphetamine. In order prove the offense of methamphetamine possession, the State must prove beyond a reasonable doubt that a person knowingly possessed methamphetamine or a substance containing methamphetamine. 720 ILCS 646/60(a)(1) (West 2022). Defendant argues that the State failed to present any evidence that defendant "was aware that the tinfoil contained .004 grams of methamphetamine." The State responds that there was

8

sufficient circumstantial evidence to support the conclusion that defendant knew that he possessed methamphetamine. We agree with the State.

¶ 27     The standard employed when faced with a challenge to the sufficiency of the evidence is well established. The standard of reasonable doubt "does not require the court to ' "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." ' " *People v. Campbell*, 146 Ill. 2d 363, 374 (1992), (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (emphasis in original), quoting *Woodby v. Immigration and Naturalization Service*, 385 U.S. 276, 282 (1966).) Rather, a reviewing court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Bush*, 2023 IL 128747, ¶ 33 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Givens*, 237 Ill. 2d 311, 334 (2010) (citing *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)). "When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant." *Id.* (citing *People v. Schmalz*, 194 Ill. 2d 75, 80 (2000)).

¶ 28     This standard of review "is applicable in all criminal cases, regardless of whether the evidence is direct or circumstantial." *Campbell*, 146 Ill. 2d at 374 (citing *People v. Pintos*, 133 Ill. 2d 286, 291 (1989)). Circumstantial evidence is sufficient to support "a conviction if it satisfies proof beyond a reasonable doubt of the elements of the crime charged." *Id.* at 379. This "standard gives 'full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Id.* at 375 (quoting *Jackson*, 443 U.S. at 319.) For this reason, a reviewing court "will not substitute its

9

judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *Id.* (citing *People v. Young*, 128 Ill. 2d 1, 51 (1989)). We "will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.* (citing *Collins*, 106 Ill. 2d at 261).

¶ 29 Defendant does not dispute that the foil contained methamphetamine. Instead, as noted above, defendant argues that the State did not prove that defendant *knowingly* possessed methamphetamine. Knowledge is a question of fact for the trier of fact to decide. *People v. Monteleone*, 2018 IL App (2d) 170150, ¶ 26. "Direct proof of a defendant's knowledge is unnecessary, and a defendant's knowledge can be inferred from the surrounding facts and circumstances." *Id.* "Knowledge may be, and ordinarily is, proven circumstantially." *People v. Ortiz*, 196 Ill. 2d 236, 260 (2001).

¶ 30 In support of his assertion that the State failed to prove that he knowingly possessed methamphetamine, defendant makes three sub-arguments: (1) there was no evidence that defendant used methamphetamine, that defendant made any statements regarding either the foil or the baggie, and that the residue from the baggie was not subjected to forensic testing at the crime lab; (2) the foil was opaque, thereby obfuscating its contents; and (3) the State presented no evidence the defendant was wearing his own clothes at the time of his arrest.

¶ 31 Although the State's case lacked direct evidence regarding whether defendant knew that he possessed the methamphetamine, there was circumstantial evidence supporting this element of the offense. First, we note that Officer Knisley responded to a call about defendant attempting to gain access to his grandmother's house by breaking a window. Upon arrival, defendant was argumentative and, initially, noncompliant with Knisley's commands. Defendant's behavior was

10

erratic and he made several threats against Knisley. During the initial search of defendant, Knisley recovered part of a plastic baggie from defendant's front, right pants pocket. This baggie contained visible residue. Although the residue from the baggie was not tested in the lab, Knisley testified that he had recovered similar evidence "well over" 50 or more times during his career, and that those baggies had subsequently tested positive for methamphetamine. Knisley believed, based upon his training and experience, that the baggie he recovered from defendant contained methamphetamine. During the second search at the jail, the foil that contained the tested methamphetamine fell to the floor immediately after the correctional officer turned the same pants pocket inside-out. This evidence was sufficient for a reasonable trier of fact to find defendant guilty beyond a reasonable doubt.

¶ 32    Turning to defendant's specific allegations on appeal, he first contends that there was no evidence that defendant used methamphetamine, defendant compares his case with the decision in *People v. Comage*, 303 Ill. App. 3d 269 (1999). In *Comage*, the defendant appealed his conviction for unlawful possession of a controlled substance. *Id.* at 271. The defendant's conviction was based upon residual cocaine found in a pipe that the defendant admitted was his and further admitted that he had used to smoke crack approximately one month earlier. *Id.* According to the testimony, the defendant claimed that although he bought cocaine on the day of his arrest, he did not use the pipe to smoke the cocaine. *Id.* The defendant also claimed to believe that he thought that once cocaine was burned, it was eliminated. *Id.*

¶ 33    Following a jury question about the word "knowingly," the trial court did not provide the jury with a definition and instead told the jury to "give the words their normal meaning." *Id.* at 272. The *Comage* court found that the trial court erred by failing to provide the jury with a definition and reversed defendant's conviction. *Id.* at 275. In determining that there was sufficient

11

evidence to warrant a new trial, the *Comage* court noted that defendant admitted to previously smoking crack out of the pipe and to possessing crack on the day of his arrest. *Id.*

¶ 34 Using the facts of *Comage* to contrast his own case, here, defendant argues that the jury did not hear any evidence that defendant used methamphetamine, that defendant made any statements about either the foil or the plastic baggie, and that the residue from the plastic baggie was not subjected to forensic testing by the crime lab. While the *Comage* court relied upon the defendant's statements in support of its conclusion that the evidence was sufficient to allow the defendant to face retrial, a defendant's statements regarding his knowledge of the presence or possible presence of contraband are not the only way the State can prove knowledge. As noted above, knowledge is ordinarily proven by circumstantial evidence. *Ortiz*, 196 Ill. 2d at 260. As noted above, we find that circumstantial evidence supports defendant's conviction.

¶ 35 In further support of his argument that the State did not prove defendant's knowing possession of methamphetamine beyond a reasonable doubt, defendant notes that the contents of the foil were hidden from view, and that one "factor that Illinois courts have relied on to assess whether a defendant has knowledge of a controlled substance in their possession is whether the controlled substance was obfuscated from their own view." In support of this claim, defendant relies on *Ortiz*, 196 Ill. 2d 236 (2001), *People v. Hodogbey*, 306 Ill. App. 3d 555 (1999), and *People v. Binns*, 27 Ill. App. 3d 978 (1975). Defendant's reliance on these cases is misplaced.

¶ 36 In *Ortiz*, the defendant was convicted of drug trafficking following a traffic stop. *Ortiz*, 196 Ill. 2d at 239. The evidence demonstrated that the defendant was driving a semitruck hauling a trailer that were both owned by another individual. *Id.* at 240. Following a consensual search of the trailer, the police discovered 100 kilograms of cocaine hidden in a secret compartment in the trailer. *Id.* The secret compartment could not be seen from the rear of the trailer; the investigating

12

officer had to climb 20-25 feet over the load to see evidence of the compartment. *Id.* at 243. The defendant testified that he was not present when the trailer was loaded and that he only opened it to determine whether the load was stable. *Id.* at 247. The Illinois Supreme Court reversed the defendant's conviction, finding that the "scant" circumstantial evidence did not support the conclusion that the defendant was aware of the cocaine. *Id.* at 260-67.

¶ 37    In *Hodogbey*, the defendant was found guilty of possession of a controlled substance (heroin) with the intent to deliver. 306 Ill. App. 3d at 556. At trial, the evidence showed that the defendant accepted a package addressed to him, but neither opened the package nor hid the package. *Hodogbey*, 306 Ill. App. 3d at 561. Instead, the defendant left the package unopened on his living room floor as he went about his other business. *Id.* When confronted by the police, the defendant neither fled nor resisted them, but instead gave them the keys to his apartment. *Id.* Based upon this evidence, the *Hodogbey* court found that the State failed to prove that the defendant had knowledge of heroin and reversed defendant's conviction. *Id.* at 562.

¶ 38    In *Binns*, the defendant was convicted of unlawful possession of marijuana. *Binns*, 27 Ill. App. 3d at 979. The evidence showed that the police recovered nine sealed envelopes of marijuana from defendant's apartment. *Id.* at 979-80. However, there was also evidence that defendant recently returned to her apartment after having been absent for several nights, and that other people stayed with her "on and off." *Id.* at 980. Significantly, there was uncontradicted testimony that another individual planted the marijuana-filled envelopes in the defendant's apartment as an act of revenge. *Id.* at 981. The *Binns* court reversed the defendant's conviction, noting that although the State proved that the defendant had constructive knowledge of three of the envelopes, there was nothing in the record to indicate that the envelopes were open, that their contents could be seen, or

13

that defendant knew, should have known, or had any reason to believe that they contained marijuana. *Id.*

¶ 39 While it is true that *Ortiz*, *Hodogbey*, and *Binns* all share the fact that the contents of a compartment, package, or envelope are not readily apparent, these cases are easily distinguishable in that all three cases also contain evidence that the defendants came into possession of the drugs via a third party under circumstances where it was plausible that the defendants had no prior knowledge of the presence of the drugs. In *Ortiz*, the drugs were in a secret compartment of a trailer he was hauling; in *Hodogbey*, the drugs were delivered via the United States Postal Service from a foreign country; and in *Binns*, the envelopes were planted by someone seeking revenge on the defendant. We further note that in all three cases, the defendants were not carrying the drugs on their person. By contrast, in the instant case, although foil is indeed opaque, it was found in the pocket of the pants defendant was wearing at the time of his arrest. While defense counsel argued, in closing, that sometimes "good citizens *** try to keep [their] area clean" by picking up candy wrappers and trash, the jury was free to reject this explanation.

¶ 40 Defendant next contends that support for his argument that the State failed to prove that defendant knowingly possessed methamphetamine can be found from the evidence that defendant told the police that he was trying to retrieve his clothes from his grandmother's house at the time of his arrest. Noting that Officer Knisley never asked defendant if the clothes he was wearing at the time of the arrest were defendant's clothes, defendant likens his situation to that of the defendant in *Ortiz* in that not only did the foil hide its contents, but defendant may have been unaware of the contraband. Again, we find defendant's reliance on *Ortiz* misplaced. Knowledge of the contents of a secret compartment in the back of a trailer is a far cry from knowledge of the contents of the pockets of the pants a person is wearing.

14

¶ 41    As explained in detail, above, although the State's case lacked direct evidence regarding whether defendant knew that he possessed the methamphetamine, there was circumstantial evidence supporting this element of the offense. Based upon the specific circumstances before us, we find that a jury could have reasonably concluded that defendant knowingly possessed methamphetamine.

¶ 42                          B. Ineffective Assistance of Counsel

¶ 43    Defendant next argues that he received ineffective assistance of counsel where counsel's failure to request a jury instruction prejudiced him. Because the defense theory of the case depended on the jury's understanding of the mental state of "knowledge," defendant claims that defense counsel was ineffective for failing to request that IPI Criminal No. 5.01B be provided to the jury. That instruction provides, in pertinent part, as follows:

> "A person knows the nature or attendant circumstances of his conduct when he is consciously aware that his conduct is of that nature or that those circumstances exist. Knowledge of a material fact includes awareness that a substantial probability of that fact exists." IPI Criminal No. 5.01B.

Citing *People v. Powell*, 159 Ill. App. 3d 1005 (1987) for the general proposition that "knowingly" has a plain meaning within a jury's common understanding, the Committee Note states that "[t]he Committee takes no position as to whether this definition should be routinely given in the absence of a specific jury request." IPI Criminal No. 5.01B, Committee Comments (Approved Oct. 28, 2016).

¶ 44    Our review of ineffective assistance of counsel claims is guided by the standards set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). To succeed on a claim of ineffective assistance of counsel under the *Strickland* standard, one must show both that (1) counsel's representation fell below an objective standard of reasonableness (deficient performance prong) and （2） a

15

reasonable probability exists that, but for the error, the result would have been different (prejudice prong). *People v. Manning*, 241 Ill. 2d 319, 326-27 (2011). A defendant must satisfy both prongs of the *Strickland* test to succeed on a claim of ineffective assistance of counsel. *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Thus, defendant's failure to establish either deficient performance or prejudice will be fatal to the claim. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). " '[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *** If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' " *People v. Albanese*, 104 Ill. 2d 504, 527 (1984) (quoting *Strickland*, 466. U.S. at 697).

¶ 45    To establish deficiency under the first prong of the *Strickland* test, defendant must overcome the strong presumption that the complained-of action or inaction might have been the product of counsel's sound trial strategy. *Manning*, 241 Ill. 2d at 327. The reviewing court must evaluate counsel's performance from her perspective at the time rather than "through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007). An evaluation of counsel's actions cannot extend into matters involving the exercise of judgment, strategy, or trial tactics. *People v. Penrod*, 316 Ill. App. 3d 713, 722 (2000). "Reviewing courts should hesitate to second-guess counsel's strategic decisions, even where those decisions seem questionable." *Manning*, 241 Ill. 2d at 335.

¶ 46    To establish prejudice, "defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *Richardson*, 189 Ill. 2d at 411. If defendant's claim can be disposed of on the basis that he suffered no prejudice, then a court should not decide whether counsel's performance was deficient. *People v. Villanueva*, 382 Ill. App. 3d 301, 308 (2008).

16

¶ 47    "The function of jury instructions is to convey to the jurors the law that applies to the facts so they can reach a correct conclusion." *People v. Hopp*, 209 Ill. 2d 1, 8 (2004). Defense counsel's choice of jury instructions and the decision regarding the theory of the defense is a matter of trial strategy. *People v. Smith*, 2025 IL App (1st) 220116, ¶ 34. As such, these "decisions enjoy a strong presumption that they reflect sound trial strategy" and are "generally immune from claims of ineffective assistance of counsel." (Internal quotation marks omitted.) *Id.* The failure to request a particular jury instruction, however, "may be grounds for finding ineffective assistance of counsel if the instruction was so critical to the defense that its omission den[ied] the right of the accused to a fair trial."(Internal quotation marks omitted.) *Id.*

¶ 48    Defendant specifically argues that while the jury was instructed that the State had to prove that "the defendant knowingly possessed a substance containing methamphetamine," none of the instructions "disambiguate[d] the concept of knowledge from possession." Accordingly, defendant contends that IPI Criminal No. 5.01B would have made it clear to the jury that the State needed to prove both that defendant possessed a substance containing methamphetamine and that defendant knew that the substance contained methamphetamine. The State responds that defense counsel's performance did not fall below an objective standard of reasonableness, and if it did, defendant has not established that he was prejudiced because the jury never expressed confusion over the term "knowingly." We agree with the State.

¶ 49    Because defense counsel's choice of instructions is a matter of trial strategy, we begin our analysis with the strong presumption that the decision to forgo IPI Criminal No. 5.01B was sound trial strategy. Although caselaw supports the conclusion that defense counsel may be ineffective for failing to offer an instruction defining "knowledge" in response to a jury inquiry (*People v. Lowry*, 354 Ill. App. 3d 760 (2004); *People v. Sperry*, 2020 IL App (2d) 180296), defendant does

17

not cite to any caselaw that stands for the proposition that the failure to request IPI Criminal No. 5.01B prior to a jury inquiry regarding the mental state of "knowledge" is, without more, deficient performance. And defendant does not contend as such. Rather, defendant "likens his case to those where defense counsel failed to tender a jury instruction in support of the theory of the defense and the instruction itself was critical such that its omission prejudiced the defendant." We reject this argument.

¶ 50    In support of this position, defendant relies on *People v. Serrano*, 286 Ill. App. 3d 485 (1997) and *People v. Pegram*, 124 Ill. 2d 166 (1988). In *Serrano*, the defendant was charged with first degree murder and three counts of armed robbery. *Serrano*, 286 Ill. App. 3d at 486. Despite the defense theory of the case that defendant was forced to participate in the armed robberies, defense counsel did not tender instructions supporting the affirmative defense of compulsion. *Id.* at 492. The *Serrano* court found that defense counsel was ineffective for failing to offer an instruction on the defense theory of the case. *Id.*

¶ 51    The defendant in *Pegram* was also charged with armed robbery. *Pegram*, 124 Ill. 2d at 168. The defendant claimed he participated in the robbery because the two other participants threatened his life. *Id.* at 171. The *Pegram* court noted that compulsion is an affirmative defense that exculpates an accused if the trier of fact finds that the elements of compulsion had been proven. *Id.* at 172. Concluding that the jury "should have been instructed on the compulsion defense and the State's burden of proof for that defense," the *Pegram* court found that defense counsel was ineffective for failing to tender an instruction regarding the same. *Id.* at 174.

¶ 52    We find defendant's reliance on *Serrano* and *Pegram* to be misplaced. In *Serrano* and *Pegram*, the juries were never instructed (1) as to the affirmative defense of compulsion, (2) that they could find the defendants not guilty if they accepted that the defendants were acting under a

18

threat of imminent infliction of death or great bodily harm at the time of the offenses, or (3) that once a defendant has adequately raised an affirmative defense, the State must rebut it beyond a reasonable doubt. See *People v. Jeffries*, 164 Ill. 2d 104, 127 (1995). In other words, neither the *Serrano* nor the *Pergram* jury was told that they could find the defendants not guilty even if the State proved the underlying elements of the charged offenses. By contrast, IPI Criminal No. 5.01B is not an instruction that adds an additional element to the underlying offense. It is a clarifying instruction that defines a mental state.

¶ 53    The jury herein was properly instructed that the State had to prove beyond a reasonable doubt that defendant knowingly possessed a substance containing methamphetamine. Defense counsel argued that the State did not prove the "knowingly" element of the offense. Defense counsel did not present an affirmative defense that created an additional matter for the State to rebut beyond a reasonable doubt. As noted above, "knowingly" has "a plain meaning within a jury's common knowledge" (*Powell*, 159 Ill. App. 3d at 1013), and the Committee Note to IPI Criminal No. 5.01B states that "[t]he Committee takes no position as to whether this definition should be routinely given in the absence of a specific jury request." IPI Criminal No. 5.01B, Committee Comments (Approved Oct. 28, 2016). For these reasons, and because the record is devoid of any evidence that the jury was confused regarding the mental state required to convict, we cannot find that defense counsel's failure to tender IPI Criminal No. 5.01B fell below an objective standard of reasonableness. Accordingly, we do not find that defense counsel was ineffective.

¶ 54    Even assuming, *arguendo*, that trial counsel's performance was somehow deficient, we find that defendant has failed to establish prejudice. As noted, there is nothing in the record before this court to suggest that the jury struggled with the definition of "knowingly." While defendant

19

expresses concern that none of the instructions "disambiguate[d] the concept of knowledge from possession," defense counsel discussed this distinction during closing argument. Specifically, defense counsel (1) mentioned that only .004 grams of methamphetamine was recovered; (2) argued that a person could unknowingly come into possession of methamphetamine by picking up trash; (3) argued that "the State has the burden to prove [defendant] guilty beyond a reasonable doubt of knowledge that he had a substance containing meth"; (4) told the jury that they were there "to decide whether or not defendant knowingly possessed methamphetamine"; (5) argued "[defendant is] charged with knowledge of having methamphetamine and *** the State did not prove [that] beyond a reasonable doubt"; (6) asked the jury, "Did [defendant] know that he had those 10 grains of meth in his pocket? No"; and (7) successfully objected that the State misstated the law when the prosecutor argued that it had "to prove beyond a reasonable doubt that [defendant] possessed meth," noting that the prosecutor "missed the term, *knowingly*." (Emphasis in original.) Therefore, the record demonstrates that defendant suffered no prejudice from defense counsel's failure to submit IPI Criminal No. 5.01B.

¶ 55                  C. Defendant's Request to Proceed *Pro Se*

¶ 56     Defendant's final argument on appeal is that the trial court erred by denying defendant's request to represent himself. He argues that he made a clear and unequivocal request to represent himself and that the trial court summarily denied that right, telling defendant that "[t]hese are very serious charges." Defendant also contends that while the court told defendant that he could later decide to hire private counsel, the judge did not tell him that going *pro se* was an alternative, and this had the practical effective of removing self-representation as a future option for defendant. The State argues that defendant's request to proceed *pro se* was not clear and unequivocal, or

20

alternatively, that defendant abandoned his request with his subsequent silence following the appointment of counsel.

¶ 57    Under the U.S. Constitution, a defendant has a sixth amendment right to represent himself. *People v. Burton*, 184 Ill. 2d 1, 21 (1998). A defendant's "waiver of counsel must be clear and unequivocal, not ambiguous." *Id.* "A defendant waives his right to self-representation unless he articulately and unmistakably demands to proceed *pro se*." (Internal quotation marks omitted.) *Id.* at 22. "In determining whether a defendant's statement is clear and unequivocal, courts have looked at the overall context of the proceedings. A court must determine whether the defendant truly desires to represent himself and has definitively invoked his right of self-representation." *Id.* "Even if a defendant gives some indication that he wants to proceed *pro se*, he may later acquiesce in representation by counsel. Under certain circumstances, defendant may acquiesce by vacillating or abandoning an earlier request to proceed *pro se*." *Id.* at 23. "In determining whether a defendant seeks to relinquish counsel, courts may look at the defendant's conduct following the defendant's request to represent himself." *Id.* at 23-24. "A defendant may forfeit self-representation by remaining silent at critical junctures of the proceedings." *Id.* at 24.

¶ 58    Defendant acknowledges that this issue was not raised in his posttrial motion but asks this court to review this issue under the second prong of the plain-error doctrine. The plain-error doctrine allows a reviewing court to reach a forfeited error under two circumstances. *People v. Moon*, 2022 IL 125959, ¶ 20. First-prong plain-error review is appropriate when a "clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant." *Id.* ¶ 20. Under second-prong plain-error review is warranted when a "clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of

21

the closeness of the evidence." *Id.* In both circumstances, the defendant bears the burden of persuasion. *People v. Herron*, 215 Ill. 2d 167, 187 (2005).

¶ 59    Second prong plain error, however, is equated with structural error, which is the type of error that erodes the integrity of the judicial process and undermines the fairness of the defendant's trial. *People v. Johnson*, 2024 IL 130191, ¶ 55. Structural error occurs when an error is of such magnitude that it undermines the framework within which the trial proceeds, not just a mere error in the trial process itself. *Id.*

¶ 60    Second prong plain error is a high hurdle and is only implemented in exceptional circumstances where, despite the absence of an objection, application of the rule is necessary to preserve the integrity and reputation of the judicial process. *Id.* ¶ 54. The structural errors identified by the United States Supreme Court and referenced by the Illinois Supreme Court include, "a complete denial of counsel, denial of self-representation at trial, trial before a biased judge, denial of a public trial, racial discrimination in the selection of a grand jury, and a defective reasonable doubt instruction." (Internal quotation marks omitted.) *Id.* ¶ 57.

¶ 61    The initial step under either prong of the plain-error doctrine is to determine whether there was a clear or obvious error at trial. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Therefore, the "the threshold inquiry is whether there was an error at all." *People v. Williams*, 2022 IL 126918, ¶ 49 (citing *People v. Jackson*, 2020 IL 124112, ¶ 81). Whether there is plain error is a question of law, which we review *de novo*. *People v. McLaurin*, 235 Ill. 2d 478, 485 (2009).

¶ 62    On October 11, 2022, defendant made his first appearance via Zoom. Defendant was told that he could hire an attorney, that one could be appointed for him if he could not afford one, or that he could waive his right to an attorney and represent himself. Defendant had to be muted due to his behavior, but when unmuted told the court that he intended to hire private counsel. Defendant

22

next appeared, again via Zoom, on October 28, 2022. Defendant indicated that he still wanted to hire private counsel and the matter was reset. On November 18, 2022, defendant appeared again via Zoom and indicated that he had been calling an attorney but had not heard back from him. It was at this point that the following exchange occurred:

> "THE COURT: Sir, if you haven't hired a lawyer yet, it looks like we need to appoint an attorney for you.
>
> THE DEFENDANT: Yeah, for right now because it's—but I do not want Ms. Mattson or nothing like that because last time she filed a motion mental health and she just did a big old—
>
> THE COURT: Sir, here is the deal. If you are going to get a free lawyer, you don't get to choose which free lawyer you are going to get. Okay. I am going to appoint Ms.—I am going to appoint Ms. Mattson to represent you.
>
> THE DEFENDANT: All right. So I'll hold off counsel. I will prohibit *pro se*. I will *pro se*.
>
> THE COURT: Sir, I'm not going to—I am not going to permit that. I am going to appoint Ms. Mattson and then you can decide later on if you want to be represented by your own attorney. These are very serious charges."

As noted above, shortly thereafter defendant had to be muted once again.

¶ 63    Defendant argues that his request to proceed *pro se* was clear and unequivocal. Considering the overall context of the proceedings, we are not convinced that defendant truly desired to represent himself. First, we note that defendant expressed on the record numerous times his desire to hire private counsel. Second, when those efforts failed, defendant initially agreed to appointed counsel. It was only when defendant realized that attorney Mattson would be appointed that defendant made a request to "hold off" on counsel and proceed *pro se*. We note that even then, defendant stated one reason why he did not want to be represented by Mattson: she apparently requested a fitness evaluation during a prior, unrelated charge. Defendant's request to proceed *pro se* was not about his desire to represent himself but was instead motivated to avoid

23

representation by Mattson. The trial court made it clear that defendant could still hire private counsel.

¶ 64    As noted above, defendant argues that the trial court's comment, on November 18, 2022, that "I am going to appoint Ms. Mattson and then you can decide later on if you want to be represented by your own attorney" fails to tell defendant that he could still represent himself. According to defendant, this omission "removed self-representation as an option for [defendant] entirely." We disagree. At a previous hearing, defendant had been informed that he could represent himself, and again, we note that within the context of the entire discussion, it was clear that defendant wanted representation, he just did not want Mattson as his attorney. Under these circumstances, it is understandable that the judge would inform defendant that he could still hire private counsel in the future.

¶ 65    Considering the overall context of the proceedings, we find that the trial court did not err by appointing counsel for defendant. Defendant sought to hire private counsel, and when the court stated that it needed to appoint an attorney, defendant initially agreed to the appointment of counsel. His only objection to appointment of Mattson as his attorney was based upon her prior representation of him, and for this reason, defendant stated that he wanted to "hold off" on counsel. Under these circumstances, and "indulg[ing] in every reasonable presumption against waiver of the right to counsel" (Internal quotation marks omitted.) (*Burton*, 184 Ill. 2d at 23), we find defendant's request was not "clear and unequivocal." There being no error, there can be no plain error.

¶ 66    Defendant notes that, even if this court were to find that defendant "gave 'some indication' that he wanted to assert his desire to represent himself, there is the question of whether [defendant] later acquiesced to appointed counsel's representation." "Even if a defendant gives some indication

24

that he wants to proceed *pro se*, he may later acquiesce in representation by counsel. Under certain circumstances, defendant may acquiesce by vacillating or abandoning an earlier request to proceed *pro se*." *Burton*, 184 Ill. 2d at 23. Defendant argues that he never vacillated nor abandoned his request to proceed *pro se*.

¶ 67 In support of his argument, defendant relies upon *Orazio v. Dugger*, 876 F.2d 1508 (1989). *Orazio* was a federal *habeus* action. In *Orazio*, the state trial court denied the defendant's request to proceed *pro se* after telling defendant that it did not "consider that [defendant's] background, education and so-called learning disabilities [were] sufficient to meet the challenges" of self-representation. *Id.* at 1509. The matter then proceeded to trial without any further protest by defendant or discussion on the matter. *Id.* After exhausting his state court remedies, defendant brought the *habeus* action. *Id.* at 1511. The federal district court denied the defendant's claim, finding that even assuming that the defendant had sufficiently asserted his right to proceed *pro se*, defendant subsequently waived that right because he never repeated the request and allowed "counsel to represent him without demonstrating displeasure." *Id.* at 1512. The Court of Appeals for the Eleventh Circuit reversed the district court.

¶ 68 After determining that the defendant was not procedurally barred from collaterally attacking the denial of his right to proceed *pro se*, the *Orazio* court addressed the merits of defendant's claim. *Id.* at 1511. The court noted that the trial court's ruling was in error because a defendant's technical legal knowledge is not relevant to the question of self-representation. *Id.* at 1512. The relevant question is whether a defendant has voluntarily exercised his own free will. *Id.* The *Orazio* court found that the defendant neither vacillated on the issue nor abandoned the issue by failing to repeat his request. *Id.* The court noted that, "[t]o avoid waiver of a previously-invoked right to self-representation, a defendant is not required to continually renew a request once it is

25

conclusively denied or to make fruitless motions or forego cooperation with defense counsel in order to preserve the issue for appeal." (Internal quotation marks omitted.) *Id.*

¶ 69    Under the facts of the case before this court, even if we were to view defendant's request to proceed *pro se* as clear and unequivocal, we find that defendant acquiesced to Mattson's appointment and abandoned any attempt to proceed *pro se*. In so doing, we find *Orazio* distinguishable. While the record before the *Orazio* court may have demonstrated that the defendant's further requests would have been fruitless, those facts do not appear in the opinion. For example, the *Orazio* court notes that following the denial of the defendant's request to proceed *pro se*, the matter then proceeded to trial without any further protest by defendant or discussion on the matter. *Id.* at 1509. Absent is any indication of how much time passed between the appointment of denial and the trial. Also absent, other than the *Orazio* court's conclusory statement, is any indication as to why a renewed request by the defendant would have been fruitless.

¶ 70    By contrast, in the instant case, we know that more than a year passed between defendant's request to proceed *pro se* and defendant's trial. The record before this court also reveals that defendant's only appearance before Judge Brandmeyer was when he was "denied" his right to proceed *pro se*. Thereafter, defendant appeared before four different judges, including the trial judge. If defendant was adamant about proceeding *pro se*, he could have requested to do so before a different judge. Based upon this record, we cannot conclude that, had defendant truly wanted to represent himself, a renewed request would have been fruitless.

¶ 71    Instead, the record shows that, over the course of the next year, defendant never complained about Mattson's representation, and he never sought to have her removed as counsel. Shortly before trial, Mattson mentioned that defendant wanted a continuance because he "might hire" private counsel, but that defendant still had not spoken with private counsel. The trial court denied

26

defendant's motion to continue the case, although the court stated it "may reconsider" the motion if private counsel entered his appearance. As noted above, "[a] defendant may forfeit self-representation by remaining silent at critical junctures of the proceedings." *Burton*, 184 Ill. 2d. at 24. Assuming *arguendo* that the trial court erred in appointing counsel to represent defendant, we find that defendant acquiesced to Mattson's representation and abandoned any request to proceed *pro se*.

¶ 72                              III. CONCLUSION

¶ 73    For the foregoing reasons, we affirm defendant's conviction.


¶ 74    Affirmed.